**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GANI LECAJ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 CV 1765 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Gani Lecaj ("Lecaj" or "claimant"), has brought a motion for summary

judgment [15] seeking judicial review of the final decision of the Commissioner of the

Social Security Administration (the "Commissioner").  The Commissioner denied Lecaj's

claim for Disability Insurance Benefits and Supplemental Security Income under the

Social Security Act (the "Act"), 42 U.S.C. §§ 416(I) and 423(d).  The Commissioner filed

a cross-motion for summary judgment [19] asking that we uphold the decision of the

Administrative Law Judge ("ALJ").  We have jurisdiction to hear this matter pursuant to

42 U.S.C. § 405(g).  For the reasons set forth below, Lecaj's motion for summary

judgment is denied and the Commissioner's motion for summary judgment is granted.

**I.    BACKGROUND**

   **A.    Procedural History**

   Lecaj filed an application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on October 22, 2004, alleging a disability beginning May 31, 1991 due to a "crushed left hand." (R. 43). The Administration denied claimant's request for benefits initially on January 1, 2005, and again on June 14, 2005 after a timely request for reconsideration. (R. 45-49, 50, 52-55). Lecaj then filed a timely request for a hearing. (R. 56). Lecaj appeared with counsel at a hearing on January 9, 2008 before ALJ Paul Armstrong ("ALJ" or "ALJ Armstrong").[1] (R. 254-293). On April 21, 2008, the ALJ issued a written decision denying Lecaj's request for benefits. (R. 33-40). On May 8, 2008 and July 10, 2008, Lecaj filed a request for review of the ALJ's decision. (R. 17-18, 24-26). The Appeals Council denied Lecaj's request for review on August 26, 2008. (R. 14-16). Lecaj then filed another request for review on October 28, 2008. (R. 11). Along with that request, Lecaj submitted the opinion of Dr. Nestor M. Ivkov ("Dr. Ivkov"), which indicated that Lecaj suffered from chronic reflex sympathetic dystrophy ("RSD") (R. 11-13). On January 23, 2009, after considering the additional information, the Appeals Council again denied Lecaj's request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 7-9); *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Lecaj subsequently filed this action.

### B.    Medical History

Lecaj suffered a crush injury to his left hand on May 31, 1990. (R. 181). Dr.

---

[1] As noted in the ALJ's opinion, the administrative hearing in this matter was originally set for February 24, 2006. (R. 33, 70). Although the ALJ indicates that the claimant appeared and testified at a hearing on that date, the administrative record does not include a transcript from that hearing. Additionally, the ALJ does not cite to any such testimony, nor do the parties indicate that any testimony was offered. As such, the Court must assume that neither the claimant, nor any medical or vocational experts, offered testimony on February 24, 2006. Instead, it appears that the claimant was sent out for two psychological evaluations and the hearing was postponed until January 9, 2008.

Ramasamv Kalimuthu ("Dr. Kalimuthu"), a treating physician from Suburban Plastic Surgery, S.C., reported that Lecaj underwent surgery at Christ Hospital on June 6, 1990 for "closed reduction and percutaneous pinning of the fractures." (*Id.*). After his initial surgery, Lecaj was discharged on June 9, 1990 and was thereafter treated by Dr. Kalimuthu. (*Id.*). Lecaj underwent pin removal on four separate occasions: July 19, July 31, August 14, and August 23, 1990. (*Id.*). Lecaj began attending occupational therapy in July 1990 and was released to work in September 1990, "with specific orders not to use his left hand at all." (*Id.*).

On July 29, 1991, Physical Therapy Review Services, Inc. ("Physical Therapy") reviewed Lecaj's claim for hand therapy services regarding his crush injury. (R. 148). Physical Therapy noted that hand therapy was ordered on June 14, 1990 for construction of a hand splint, and "hand therapy seemed to continue on anywhere from a twice weekly basis to four times weekly through July, August, and September 1990." (*Id.*). Additionally, in November 1990 until June 4, 1991, "care three times weekly continued." (*Id.*). On February 4, 1992, Dr. Kalimuthu noted that Lecaj's disability "is permanent with no chance of any improvement" and that he will "never be able to return to his former occupation," but should be "rehabilitated for another occupation." (R. 181).

On July 7, 2003, Lecaj complained of numbness in his right hand and shoulder pain. (R. 155). Dr. Kalimuthu noted that Lecaj had "stiffness to the left hand," and the "inability to flex the little, ring, and middle fingers." (*Id.*). Dr. Kalimuthu also reported that Lecaj had "wasting of the left hand" and that Lecaj's right shoulder had "pain and paresthesia to the median nerve distribution area of the right hand." (*Id.*).

On November 29, 2004, Lecaj told Dr. Kalimuthu that his left hand hurt from his "hand all the way up to his shoulder." (R. 151). Lecaj saw Dr. Kalimuthu again on February 28, 2005. (R. 149). Dr. Kalimuthu noted that Lecaj was "a little dizzy at times [when] walking." (*Id.*).

One month later, on March 22, 2005, Dr. Myoung Kim ("Dr. Kim"), from the Advocate Christ Medical Center, performed an electrodiagnostic test on Lecaj for his left hand and upper extremity numbness. (R. 158). Dr. Kim reported that the test indicated normal functioning of the left median and ulnar nerves. (*Id.*). The findings were "mostly consistent with left C7 and C8 radiculopathy." (*Id.*).

On June 20, 2005, Lecaj reported to Dr. Kalimuthu that he could not "tolerate air-conditioning due to [his] hand." (R. 183). On October 13, 2005, Dr. Kalimuthu noted that Lecaj was experiencing dizziness. (R. 187). On February 20, 2006, Dr. Kalimuthu again noted occasional dizzy spells and also that Lecaj had "right hand numbness/weakness." (R. 191).

On April 10, 2006**,** Dr. Erika L. Liljedahl ("Dr. Liljedahl") performed a psychological evaluation for the Bureau of Disability Determination Services ("DDS"). (R. 174-77). Dr. Liljedahl noted that Lecaj's typical day included showering, taking walks, going to the store, and taking his son to school. (R. 175). Lecaj indicated he did "very little" chores "out of choice," but that he sometimes took the trash out. (*Id.*). Additionally, Lecaj stated that his cooking skills were "good" but his wife did the cooking. (*Id.*). Dr. Liljedahl opined that Lecaj was "fine" and that he had no psychological diagnosis. (R. 177). Dr. Liljedahl also reported that Lecaj made a "conscious choice to present himself poorly and wanted to convince the evaluator of his 'disability' and need

for finances." (*Id.*). In her accompanying report, titled "Medical Source Statement of Ability To Do Work-Related Activities (Mental)," dated April 18, 2006, Dr. Liljedahl found no mental limitations to Lecaj's ability to do work-related activities on a sustained basis. (R. 178-180).

On May 22, 2006, Dr. Kalimuthu indicated that Lecaj experienced occasional dizziness. (R. 199). On August 21, 2006 and November 13, 2006, Dr. Kalimuthu noted the "usual" pains. (R. 195, 197).

Dr. Liljedahl conducted a second psychological evaluation for the DDS on April 11, 2007. (R. 171-73). Lecaj stated that he does "nothing but watch TV sometimes" and that his chores included taking out the garbage "with one hand." (R. 171). Lecaj also stated that his cooking skills included "using the microwave oven, [and making] simple meals like oatmeal." (*Id.*). Lecaj reported that he is "fairly happy," but also reported "being sad because of his hand pain." (R. 172). Dr. Liljedahl again made no psychological diagnosis, and noted that Lecaj made "no reports of mood disturbance and [had] no significant problems in thinking or behavior." (R. 173). Dr. Liljedahl found no mental limitations to Lecaj's ability to do work-related activities. (R. 168-170).

On October 25, 2007, Dr. Jaroslaw Czarnkowski ("Dr. Czarnkowski"), a psychiatrist at The Center for Neurobehavioral Services, diagnosed Lecaj with "mood disorder due to chronic pain." (R. 201). Dr. Czarnkowski found that Lecaj had chronic depressive symptoms, including having "previously enjoyed activities [that] are no longer pleasurable; a loss of energy or motivation; excessive worrying; fatigue; a sense of guilt; irritability; sadness; feelings of worthlessness; helplessness, hopelessness." (*Id.*). Dr. Czarnkowski also reported that Lecaj had difficulty sleeping and concentrating.

5

(*Id.*). He noted that Lecaj would continue to take Zoloft, and he also recommended Lyrica and Klonopin. (*Id.*). On December 6, 2007, Dr. Czarnkowski noticed "decreased anxiety symptoms," "worsening of depressive symptoms," and an increase in "feelings of sadness." (R. 216).

Finally, on October 16, 2008, Dr. Ivkov, a neurologist at Neurologic Associates, Ltd., found that Lecaj's "upper extremities showed atrophy of the left biceps of mild to moderate degree left forearm of moderate degree and left hand of moderate degree with the deformities of the third and fourth finger in terms of pronounced ulnar deviation, bony abnormalities, skin atrophy, and limited extension and flexion of the hands." (R. 12). Additionally, Dr. Ivkov opined: "I understand that there has been question of whether this is RSD or not and I believe that it is in chronic form." (R. 13). Dr. Ivkov also noted a history of depression and found "hyperflexia in both upper extremities." (*Id.*). As mentioned above, claimant submitted Dr. Ivkov's report to the Appeals Council in conjunction with Lecaj's request for review.

### C.    The Residual Functional Capacity Determination

On June 1, 2005, Dr. Kim Young-Ja ("Dr. Young-Ja") completed a physical residual functional capacity ("RFC") assessment for Lecaj. (R. 160-67). Dr. Young-Ja noted that there were "some signs of atrophy of the left hand" and Lecaj could not "make [a] fist due to 3rd, 4th, and 5th finger problems." (R. 167). Dr. Young-Ja reported that Lecaj could "lift and carry 20 lbs occasionally and 10 lbs frequently." (R. 160). Dr. Young-Ja also noted that Lecaj could "sit, stand and walk through a 6 to 8 hour day." (R. 167). Additionally, Dr. Young-Ja opined that although Lecaj could use his left hand to help balance weight with carrying and lifting, he was "restricted from

fingering and gripping with [his] left hand," and should, "avoid climbing ladders, ropes, and scaffolds." (*Id.*).

On October 18, 2007, Dr. Joseph A. Kowalczyk ("Dr. Kowalczyk"), a treating physician at Dr. Dale S. Raines & Associates, Ltd., completed a physical RFC assessment for Lecaj. (R. 202-05). Dr. Kowalczyk saw Lecaj for "general health issues since 2003." (R. 202). In his RFC assessment, Dr. Kowalczyk indicated that Lecaj reported "chronic left hand pain and left shoulder pain." (*Id.*) Dr. Kowalczyk further indicated that Lecaj had "atrophic deformed fingers" on his left hand, which prohibit him from making a fist with his left hand. (*Id.*). He also noted that Lecaj took Zoloft for pain and opined that the "situation will not improve." (R. 203). Dr. Kowalczyk reported that Lecaj had no postural limitations, but that he did have manipulative limitations of his left hand such that he would have to rest for more than fifteen minutes during the day due to his left hand pain. (R. 203). According to Dr. Kowalczyk, Lecaj could briefly lift ten to fifteen pounds with his left hand, and would have difficulty "grasping, pulling, pushing or doing fine manipulations" with his hands. (R. 204). Finally, Dr. Kowalczyk opined that "judging by the appearance of his hand, [his pain] appears credible." (R. 205).

On December 6, 2007, Dr. Czarnkowski completed a mental RFC assessment. (R. 217-221). In his analysis, Dr. Czarnkowski noted that he saw Lecaj for monthly medication management sessions. (R. 217). He again diagnosed Lecaj with a "mood disorder due to chronic pain" and a "generalized anxiety disorder." (*Id.*). Dr. Czarnkowski stated that Lecaj's mental abilities would be "limited but satisfactory" in responding appropriately to "changes in a routine work setting," dealing with "normal work stress," and dealing with stress related to semi-skilled or skilled work. (R. 219-

220).  He also found Lecaj's limitations to be "related more to his injury and chronic pain than to mood and anxiety symptoms."  (R. 220).  Out of the twenty-five categories Dr. Czarnkowski rated, he found claimant had no lower limitation than "limited but satisfactory."  (R. 219-220).  Further, Dr. Czarnkowski opined that Lecaj's depressive symptoms and chronic anxiety affects [his] pain perception."  (R. 220).

### D.    Claimant's Testimony

According to claimant's testimony, he took college business courses at some point prior to the date of his hand injury.  (R. 265-66).  Thereafter, Lecaj and his family opened a restaurant together.  (R. 266).  Lecaj did not get along with his brother, so he left the family business and worked for the company at which he eventually suffered the crush injury to his hand during a forklift accident.  (*Id.*)

After his injury, Lecaj testified that he worked at the family restaurant as a short-order cook.  (R. 262).  Lecaj cooked burgers, chicken, steaks and omelettes.  (R. 264-65).  When asked how he could make omelettes with one hand, Lecaj testified that he "used one hand for the two hands."  (R. 265.)  Lecaj also handled the cash register at times and supervised waitresses and busboys.  (R. 263, 272).  The claimant testified that as a short-order cook, he worked approximately four to five hours a day, three to five days a week.  (R. 275, 278).  In 2004, the family business closed when a bank bought the entire block.  (R. 264).  Lecaj did not acquire any assets from the sale of the business, as he had no ownership interest.  (R. 262, 277).

At the time of the hearing, claimant testified that his right hand and shoulder were "just as bad" as the left side because he uses the right side so much.  (R. 269).  Lecaj further testified that "all the medication" he takes, including the "high blood pressure

medication," Lipitor and Zoloft, make him dizzy. (R. 271-72). There was also testimony indicating that the "charley horse" in his left leg caused dizziness and that his pain caused dizziness. (R. 272, 280).

The ALJ questioned Lecaj as to whether he believed he could be a host at a restaurant. (R. 272-73). Lecaj testified that he did not think anyone would want to hire him, but if he had "no other choice," he would work in a restaurant. (R. 273). However, Lecaj testified that he would not be able to do the job due to his dizziness and the pain in his hand. (*Id.*). Additionally, Lecaj testified that the pain was worse at the time of the hearing than when he had been working. (R. 284).

### E.    Statements From Claimant's Family Members

Lecaj's wife, sister, and oldest daughter provided written statements regarding his disability status. (R. 212-15). In those statements, the family members emphasized Lecaj's "severe pain" and his limited abilities to care for his own personal needs, to care for the home, and to enjoy recreational activities. (*Id.*).

### F.    Medical Expert's Testimony

Dr. Walter Miller testified as the medical expert at the hearing ("ME Miller"). (R. 284). ME Miller testified that the record showed that Lecaj had some "fractures in his fingers, that bend them, that didn't heal very well." (*Id.*). ME Miller stated that there was an indication of some atrophy, which raised the question of nerve injury. (R. 284-285). Although the electrodiagnostic test performed by Dr. Kim showed no peripheral nerve injury, ME Miller questioned the reliability of the exam and the fact that there were no follow-up studies or x-rays to verify the results. (R. 285).

ME Miller opined that there was no proven end organ damage that would cause

Lecaj's dizziness.  (*Id.*).  He reported that Lecaj had "typical hypertension."  (*Id.*).  He also stated that the dizziness could be related to hypertension, "just like dizziness can be related to maybe a thousand other things."  (R. 287).

Additionally, ME Miller opined that although Lecaj's alleged pain in his right arm and shoulder may be due to overuse, "muscles only get stronger over a period of time" when they are used.  (R. 286).  Lastly, ME Miller agreed with the DDS determination that Lecaj could do light work with "no ropes, ladders or scaffolds and no manipulatives with the left non-dominant hand."  (*Id.*).

### G.    Vocational Expert Testimony

Cheryl Hoiseth testified as the vocational expert ("VE Hoiseth").  (R. 287).  VE Hoiseth indicated that she was testifying in accordance with the information contained in the "Dictionary of Occupational Titles, Selected Characteristics of Occupations."  (*Id.*)  She testified that Lecaj's past relevant work as a short-order cook was at the light exertional level, which is at the "low end of the semi-skilled continuum."  (R. 288).  The ALJ then asked VE Hoiseth if a person with the following conditions could perform any of claimant's past work: "no manipulatives with his left, non-dominant hand, but no limitations with the right; no climbing of ropes, ladders or scaffolds because of dizziness;" and "no work at unprotected heights, around dangerous, moving machinery, flames or bodies of water."  (*Id.*).  VE Hoiseth testified that such a person would not be able to return to Lecaj's past relevant work.  (*Id.*).  However, VE Hoiseth testified that such a person could be a lobby attendant or a restaurant host.  (*Id.*).

The ALJ also asked VE Hoiseth whether the same individual could complete any jobs if he had difficulties concentrating due to pain.  (R. 290).  VE Hoiseth testified that

the individual could not perform skilled jobs such as a restaurant host, but could perform unskilled jobs such as a lobby attendant. (R. 290). The ALJ followed up by asking whether the same individual would be able to work any jobs if his pain prevented him from "concentrat[ing] on even a simple, unskilled job for an average of 15 minutes out of every hour." (R. 290-91). Under these circumstances, VE Hoiseth testified that the individual would be unable to work either the host job or the lobby attendant job. (R. 291).

## II.  LEGAL ANALYSIS

### A.  Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Our review is deferential and we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* Though the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence...[to

11

enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180,

181 (7th Cir. 1993) (*per curiam*) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th

Cir. 1985)).

### B.     Analysis Under the Social Security Act

To qualify for disability insurance benefits, the claimant must be "disabled" as

provided in the Act.  A person is disabled under the Act if "he or she has an inability to

engage in any substantial gainful activity by reason of a medically determinable physical

or mental impairment which can be expected to last for a continuous period of not less

than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is

disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant

is currently employed, (2) whether the claimant has a severe impairment, (3) whether

the claimant's impairment is one that the Commissioner considers conclusively

disabling, (4) if the claimant does not have a conclusively disabling impairment, whether

[he] can perform [his] past relevant work, and (5) whether the claimant is capable of

performing any work in the national economy."  *Dixon,* 270 F.3d at 1176.  While the

claimant has the burden of establishing a disability at steps one through four, if the

claimant reaches step 5, "the burden shifts to the ALJ to establish that the claimant is

capable of performing work in the national economy."  *Zurawski*, 245 F.3d at 886.

Here, ALJ Armstrong followed the five-step analysis.  At step one, the ALJ found

that claimant had not engaged in substantial activity since the alleged onset of the

disability.  (R. 35-36).  At step two, the ALJ found claimant's left hand crush injury and

degenerative disc disease of the neck to be severe impairments.  (R. 36).  At step three,

the ALJ determined that neither the claimant's left hand crush injury nor his

12

degenerative disc disease "meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1." *Id.* Next, the ALJ found that the claimant had the physical and mental RFC to perform light work. (R. 36-38). As to the claimant's credibility, the ALJ found that his statements concerning the persistence and limiting effects of his symptoms were not credible because they were inconsistent with the RFC assessment. (R. 37-38). At step four, the ALJ determined that claimant was unable to perform his past relevant work as a short-order cook. (R. 38-39). Finally, in step five, the ALJ found that there were a significant number of jobs in the national economy that claimant could perform. (R. 39-40).

Lecaj argues that the ALJ erred by ignoring significant medical evidence in his favor. He also contends that the ALJ erred by not including any limitations caused by his alleged mental impairments in the hypothetical questions posed to the VE. Lecaj further argues that the ALJ failed to properly analyze the opinion of his treating physician. Next, Lecaj contends that the ALJ's credibility determination was "patently wrong." And, finally, Lecaj argues that the Appeals Council should have remanded this case to the ALJ in light of Dr. Ivkov's report regarding RSD.

## C.    The ALJ Did Not Err in Failing to Consider Medical Evidence

Lecaj first argues that the ALJ erred in failing to consider certain medical evidence, namely Dr. Czarnkowski's medical records and opinions regarding claimant's purported mental limitations. We disagree. When the ALJ fails to mention "an entire line of evidence" in the decision, a reviewing court is unable to conduct a meaningful review because the court cannot establish if substantial evidence supports the denial of benefits. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). However, the ALJ is not

13

required to address every piece of testimony and evidence in the record. *Diaz*, 55 F.3d at 308. Instead, the ALJ must articulate, at some minimum level, his analysis of the evidence to allow this Court to trace the path of his reasoning. *Id.* at 307. Here, although the ALJ did not address every piece of evidence, we are able to trace the path of the ALJ's reasoning.

As explained above, Dr. Czarnkowski diagnosed Lecaj with a "mood disorder due to chronic pain" and a "generalized anxiety disorder." (R. 217). Dr. Czarnkowski also stated that Lecaj's limitations are "related more to his injury and chronic pain than to mood and anxiety symptoms." (R. 220). Finally, Dr. Czarnkowski did not rate any of Lecaj's mental limitations below the standard of "limited but satisfactory." (R. 219-220).

While the ALJ does not explicitly consider Dr. Czarnkowski's medical reports in his opinion, as a treating physician, Dr. Czarnkowski's opinion was entitled to controlling weight if only it was consistent with the record as a whole. 20 C.F.R. § 404.1527(d)(4). Here, Dr. Czarnkowski's opinions were inconsistent with other evidence in the record, including both of Dr. Liljedahl's reports, which found no work-related mental limitations. Furthermore, the ALJ did consider the relevant information contained in Dr. Czarnkowski's opinion to the extent Dr. Czarnkowski found Lecaj's "limitations" to be "related more to his injury and chronic pain than to mood and anxiety symptoms." (R. 220). In that regard, the ALJ considered the relevant portion of Dr. Czarnkowski's opinion, namely, Lecaj's purported chronic pain. However, as discussed below, the ALJ dismissed Lecaj's allegations of "chronic pain and functional limitations" in part because he returned to work in 1996 after his accident and continued to work through 2004. (R. 38). Therefore, we find that the ALJ considered all of the relevant, consistent medical

14

evidence in the record and built a logical bridge from that evidence to his conclusion. Accordingly, the ALJ did not err by excluding a discussion of Dr. Czarnkowski's opinion.

### D. The ALJ Did Not Err in His Hypothetical Questions to the Vocational Expert

Next, Lecaj contends that the ALJ erred by not including all of his limitations in the hypothetical questions posed to the VE. Specifically, claimant argues that the ALJ failed to include any limitations caused by Lecaj's alleged mental impairments. Ordinarily, hypothetical questions posed to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009); *Herron*, 19 F.3d at 337.

Here, we conclude that the hypothetical questions posed by the ALJ properly reflected Lecaj's impairments to the extent that they were supported by medical evidence in the record. As explained in more detail above, claimant's purported mental limitations were inconsistent and unsupported by the record as a whole. Additionally, as the Commissioner argues, Dr. Czarnkowski rated Lecaj's limitations in a work setting, and no limitation fell below the standard of "limited but satisfactory." (R. 218-220). Dr. Czarnkowski even noted that any such "limitations are related more to his injury and chronic pain than to mood and anxiety symptoms." (R. 220).

In his second hypothetical to VE Hoiseth, the ALJ asked if there were any jobs that an individual with Lecaj's physical limitations who "has difficulties with pain, which would...make it impossible for him to do any skilled job" could perform. (R. 290). VE Hoiseth answered that such an individual would be able to work as a lobby attendant. (*Id*.). This hypothetical question adequately reflects Lecaj's work-related limitations and

rationally encompassed impairments stemming from Lecaj's chronic pain.  We thus

conclude that the ALJ did not err in the hypotheticals he posed to VE Hoiseth.

**E.      The ALJ Did Not Err in His Consideration of Dr. Kowalczyk's Opinion**

Lecaj argues that the ALJ's decision was flawed because he failed to provide

good reasons for rejecting Dr. Kowalczyk's opinion regarding claimant's limitations.

Specifically, Lecaj argues that the ALJ failed to discuss Dr. Kowalczyk's determination

that Lecaj would need to rest for more than 15 minutes during the day due to his pain

and that he could barely lift up to ten to fifteen pounds.  (R. 202-205).  Under the Act, a

court must sustain the ALJ's findings if they are supported by substantial evidence.  42

U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support [the ALJ's] conclusion.  *Richardson v. Perales*, 402

U.S 389, 401 (1971).

Here, the ALJ adequately outlined the claimant's medical history, including Dr.

Kowalczyk's RFC assessment.  (*See* R. 37-38).  The ALJ noted that Dr. Kowalczyk

affirmed the claimant's "left hand crush injury with deformed fingers of the left hand and

shoulder pain." (*Id.*).  Additionally, the ALJ noted that Dr. Kowalczyk reported that the

claimant was "unable to make a fist, and takes Zoloft to help with pain symptoms."  (*Id.*).

Finally, the ALJ considered Dr. Kowalczyk's opinion that the "claimant had no postural

limitations, but did have manipulative limitations of the left hand." (*Id.*).  The ALJ's

review of Dr. Kowalczyk's findings regarding pain and limitations rationally

encompassed Dr. Kowalczyk's opinion that the claimant would have to rest for more

than fifteen minutes due to pain and could briefly lift ten to fifteen pounds.  (R. 203-204).

Additionally, two doctors directly contradicted Dr. Kowalczyk's opinion. First, Dr. Young-Ja reported that Lecaj could "lift and carry 20 lbs occasionally and 10 lbs frequently." (R. 167). Second, ME Miller testified that Lecaj could do "light work...and no manipulatives with the left non-dominant hand." (R. 286). According to 20 C.F.R. § 404.1567(b), "light work" in part involves "lifting no more than 20 pounds at a time." Consequently, substantial evidence supports the ALJ's decision and his rejection of Dr. Kowalczyk's opinion. Moreover, an ALJ is not required to address every piece of testimony and evidence in the record. *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 2005). Rather, the ALJ must articulate, at some minimum level, his analysis of the evidence to allow this Court to trace the path of his reasoning. *Id.* at 307. Here, the ALJ has sufficiently articulated a logical path of reasoning.

## F. The ALJ's Credibility Finding Was Not Flawed

Next, Lecaj contends that the ALJ's credibility finding was flawed because he failed to address claimant's testimony that he worked only part-time at the family restaurant due to pain, and erred in finding that claimant's statements regarding his limitations were inconsistent. It is well established that the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness" and, as such, a reviewing court affords the ALJ's credibility finding special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The court may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008).

Here, ALJ Armstrong found that the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were "not credible to the

extent they are inconsistent with the residual functional capacity assessed herein." (R. 37). But the ALJ did not stop with this conclusory statement and, as required, went on to explain his credibility finding. *See* Social Security Ruling 96-7p ("It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'").

First, with respect to claimant's allegations of severe pain and functional limitations, ALJ Armstrong noted that despite these purported limitations, claimant worked in his family's restaurant as a short-order cook from 1996 through 2004, at which time the restaurant closed. (R. 38). According to Lecaj, the ALJ's failure to address the fact that Lecaj only worked part-time, possibly with special accommodations, leaves his credibility finding unfounded. We disagree. As illustrated by the hearing transcript, ALJ Armstrong was well aware that Lecaj worked part-time in a family owned restaurant. (R. 262-63). The ALJ's failure to mention this in conjunction with his credibility finding is not fatal as he clearly explains that claimant's ability to work for 8 years, albeit it part time, is inconsistent with his allegations of severe pain and limitations. Further, the ALJ's finding that claimant did not engage in "substantial gainful activity" after the alleged onset date of disability does not support the conclusion that the ALJ's credibility finding was patently wrong. As the ALJ explained, he gave the claimant the "benefit of the doubt" under this step after noting that Lecaj, an employee of a family owned business, may have been paid more than his work was worth. (R. 36). As such, the ALJ's determination was based more on the yearly earning statements than on Lecaj's allegations of pain and limitations.

The ALJ also noted that the claimant's statements regarding limitations to his

daily activities were inconsistent. (R. 38). The ALJ explained that in his disability application, Lecaj reported that he "needed assistance with nearly everything, including opening cans and jars, mixing ingredients, washing, etc." (*Id.*). However, in the evaluation with Dr. Liljedahl, claimant indicated that "he performed personal grooming tasks, fed himself, went to the store and took his son to school." (*Id.*). Moreover, the ALJ took into consideration Lecaj's statement that "he did 'very little' chores but that this was out of choice, rather than related to any physical or mental limitation." (*Id.*). The ALJ expressly took these inconsistencies into account when weighing claimant's credibility and we disagree that the statements are not in fact inconsistent as claimant now claims. (*Id.*).

Lastly, and as the Commissioner notes, the ALJ considered Dr. Young-Ja's RFC assessment, which reflected his determination that claimant can perform light exertional work, and the opinions of Dr. Miller and Dr. Kalimuthu. (R. 38). With respect to Dr. Kalimuthu, the ALJ noted that while he indicated that Lecaj could not return to his past work as a cook, he did not provide any specific work-related limitations. (*Id.*). These opinions provide additional support for the ALJ's credibility determination. For all of these reasons, and given the strict deferential standard of review, we cannot say that the ALJ's credibility determination warrants reversal.

### G. The Appeals Council Did Not Err in Failing to Remand This Case to the ALJ

Finally, Lecaj argues that the Appeals Council erred in declining to remand his case to the ALJ in light of Dr. Ivkov's report diagnosing him with RSD on October 16, 2008. According to Lecaj, the Appeals Council committed a legal error by not following

Social Security Ruling 03-02p, which provides some guidance with respect to RSD.

As an initial matter, we note that Lecaj is not seeking remand pursuant to 42 U.S.C. § 405(g).  Under "sentence six" of that provision, the court may remand the matter where "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g); *see also Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir.1997). Instead, Lecaj take issue with the Appeals Council's failure to properly consider Dr. Ivkov's report and its denial of claimant's request for review.

However, claimant's argument is a non-starter.  The Appeals Council will review a case if the claimant submits "new and material evidence" that, in addition to the evidence already considered by the ALJ, makes the ALJ's decision "contrary to the weight of the evidence" in the record.  20 C.F.R. § 404.970(b).  A reviewing court evaluates *de novo* whether the Appeals Council made an error of law in denying review. *Getch*, 539 F.3d at 483 (quoting *Perkins*, 107 F.3d 1294).  Absent legal error, the Council's decision whether to review is "discretionary and unreviewable."  In other words, "where the Appeals Council considers the new evidence along with the rest of the record and declines to remand because there is nothing before it that undermines the ALJ's decision, we shall not review the Council's discretionary decision."  *Getch*, 539 F.3d at 483.

Here, the Appeals Council indicated that it considered the "additional information," but found no reason under its rules to review the Administrative Law Judge's decision and denied claimant's request for review.  (R. 7).  This denial, even without proper explanation is a non-reviewable decision.  *See e.g. Bush v. Astrue*, 571

F. Supp. 2d, 866, 873 n.8 (2008) (concluding that "the Appeals Council's unexplained denial of Plaintiff's request for review is not judicially reviewable.").  As such, claimant's reliance on the directives of SSR 03-02p is misplaced and we decline his request to remand.

## III.    CONCLUSION

For the reasons set forth above, the Court denies claimant's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.  It is so ordered.

ENTERED:

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: March 24, 2011**